Filed 11/22/21  P. v. Runderson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>ISAIAH DAVON RUNDERSON et al.,<br><br>　　Defendants and Appellants. | F074056<br><br>(Super. Ct. No. F15907050)<br><br>**ORDER MODIFYING OPINION**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is hereby ordered that the opinion filed herein on October 29, 2021, be modified as follows:

On page 43, the second full paragraph beginning "However, we strike …" is deleted and replaced with the following paragraph:

> However, we strike the section 12022.53 subdivision (d) and subdivision (e) enhancements as to Runderson and Hawkins, as we explain below.

There is no change in the judgment.

FRANSON, Acting P.J.

WE CONCUR:

PEÑA, J.

SMITH, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>ISAIAH DAVON RUNDERSON et al.,<br><br>  Defendants and Appellants. | F074056<br><br>(Super. Ct. No. F15907050)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant Isaiah Davon Runderson.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Donte James Hawkins.

Law Office of Beles and Beles, Robert J. Beles and Joseph L. Ryan for Defendant and Appellant Jalonie Lamont Jones.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Stephanie A. Mitchell for Plaintiff and Respondent.

-ooOoo-

Isaiah Davon Runderson, Donte James Hawkins, and Jalonie Lamont Jones (together appellants) were convicted, as charged, with attempted murder, second degree robbery and assault with a deadly weapon. Various gang and arming enhancements were found true. On appeal, appellants contend the evidence was insufficient to support the gang enhancement findings; the admission of the gang expert's testimony violated California hearsay law and the Sixth Amendment right of confrontation; the trial court violated their rights to confront and defend witnesses in limiting cross-examination; and the Penal Code section 12022.53, subdivision (d)[1] arming enhancements must be vacated due to lack of notice and findings. In supplemental briefing, appellants contend their cases should be remanded to allow the trial court discretion to strike the section 12022.53, subdivision (b) arming enhancements under Senate Bill No. 620. In addition, Jones contests the sufficiency of the evidence on the underlying offenses; challenges the pretrial photographic lineup identification; and contends his case must be remanded for a transfer hearing under Proposition 57.

We originally issued an opinion on April 9, 2020, which was subsequently modified on May 7, 2020 and again modified on May 21, 2020. We reversed the gang enhancement findings as to Runderson, Hawkins and Jones, and, as to Runderson and Hawkins, the section 12022.53, subdivision (d) enhancements. We remanded to the trial court so it could, among other things, exercise its discretion on whether to dismiss the remaining firearm enhancements. As for Jones, we further ordered that his convictions and sentence be conditionally reversed and remanded to the juvenile court with directions to conduct a transfer hearing.

---

**1** All further statutory references are to the Penal Code unless otherwise stated.

2

On June 30, 2020, the People filed a petition for review in the California Supreme Court (S263068). The Supreme Court granted review and deferred briefing until the high court decided *People v. Garcia* (S250670) and *People v. Valencia* (S250218). On July 1, 2021, the Supreme Court decided the *Garcia* and *Valencia* cases in a joint opinion, *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*). On September 15, 2021, the Supreme Court transferred this case back to this court with directions to vacate our opinion and to reconsider in light of *Valencia*. We do so now and, following supplemental briefing, reaffirm our earlier majority decision.

## STATEMENT OF THE CASE

Appellants were charged in count 1 with attempted murder (Pen. Code, §§ 664, 187, subd. (a)); in count 2 with second degree robbery (§ 211); and in counts 3, 4 and 5 with assault with a deadly weapon (§ 245, subd. (a)(2)). The following enhancements were alleged: a gang allegation (§ 186.22, subd. (b)(1)) as to appellants on all counts; a personal use of a firearm enhancement (§ 12022.53, subd. (b)) as to Runderson on count 1, as to all appellants on count 2, and as to Jones on count 3; a personal use and intentional discharge of a firearm causing great bodily injury enhancement (§ 12022.53, subd. (d)) as to Jones on counts 1, 2 and 3; and as to all appellants, that they were principles in the commission of counts 1 and 3 and that Runderson was a principal in the commission of count 2 (§ 12022.53, subd. (e)).

Appellants were found guilty by jury as charged.

Runderson was sentenced to prison for 12 years four months, plus 25 years to life, as follows: on count 1, to seven years, plus 25 years to life on the section 12022.53, subdivision (d) and subdivision (e) enhancement;[2] on count 4 to one year, plus one year eight months on the gang enhancement; and on count 5 to one year, plus one year eight

---

[2] The abstract of judgment incorrectly lists this as an enhancement pursuant to section 186.22, subdivision (b).

months on the gang enhancement. The trial court struck the punishment on the gang enhancements on counts 1, 2 and 3, and stayed Runderson's sentence on the remaining counts and enhancements.

Hawkins was sentenced to prison for 14 years four months, plus 25 years to life, as follows: on count 1, to nine years, plus 25 years to life on the section 12022.53, subdivision (d) and subdivision (e) enhancement;[3] on count 4 to one year, plus one year eight months on the gang enhancement; and on count 5 to one year, plus one year eight months on the gang enhancements. The trial court struck punishment on the gang enhancements on counts 1, 2 and 3, and stayed Hawkins's sentence on the remaining counts and enhancements.

Jones was sentenced to prison for 24 years four months, plus 25 years to life, as follows: on count 1, to nine years, plus 10 years on the gang enhancement, plus 25 years to life on the section 12022.53, subdivision (d) and subdivision (e) firearm enhancement; on count 4 to one year, plus one year eight months on the gang enhancement; and on count 5 to one year, plus one year eight months on the gang enhancement. The trial court struck punishment on the gang enhancement on counts 2 and 3 and stayed Jones's sentence on the remaining counts and enhancements.

## STATEMENT OF THE FACTS

In March of 2015,[4] victim Brandon M. was living in Bakersfield and attending Cal State Bakersfield. During spring break, Brandon M., his roommate, B.B., and his basketball teammate, Cortez C., went to Los Angeles together in Brandon M.'s Dodge Challenger. On March 27, B.B. drove Brandon M. and Cortez C. from Los Angeles to Fresno in the Challenger. Brandon M. wanted to get a "grill" for his teeth, but the shop

---

**3** See footnote 2, *ante*.

**4** All further dates are to 2015 unless otherwise indicated.

was closed. Brandon M. then asked B.B. if she knew someone he could buy a gun from. He also wanted to buy some marijuana and alcohol to take back to Los Angeles.

In Fresno, B.B. picked up her friend, K.M., who was going to help Brandon M. buy a gun. Brandon M. had not met K.M. before. K.M. told B.B. to drive to the Target at Riverpark to meet Runderson. B.B. had introduced Brandon M. to Runderson and another individual, Hawkins, six to eight months earlier, and Brandon M. had hung out with them a few times in Fresno. Brandon M. called Hawkins "D-Hawk."

When they got to Riverpark, Brandon M., K.M. and Cortez C. got out of the car and talked to Runderson, who arrived in an Audi. Two other males and a female were with Runderson. According to Brandon M., the Audi looked like Runderson's girlfriend's car. The two males got out of the car, but the female stayed in the car. B.B. did not see Hawkins at Riverpark.

After that, B.B., with Brandon M., K.M. and Cortez C. in the Challenger, followed the Audi to various locations around Fresno. Brandon M. was getting directions from someone in the Audi and he told B.B. where to drive. Along the way, Brandon M. talked to Runderson briefly at a Jack in the Box and "[e]verything was cool." But then Brandon M. received a text message from Runderson that said, "Pull over right quick. D-Hawk want to holler at you about something. He said he missed you."

B.B. followed the Audi to a rural location where the Audi stopped and B.B. parked behind it. K.M. got out of the Challenger and talked to someone in the Audi, while the others stayed in the Challenger. Runderson then got out of the Audi and walked over to the Challenger to talk to Brandon M. B.B. had a "bad feeling" that "[s]omething just wasn't right," and she drove away leaving K.M., who then got a ride in the Audi.

B.B. returned and then followed the Audi into a neighborhood where Runderson got out of the Audi and told B.B. and the others he had to get some weed from his father and told them to wait. Runderson returned to the Audi and it drove away. B.B. turned

her car in the direction where she could see traffic coming and going because she had an "uneasy feeling."

The Audi returned about five minutes later and stopped behind the Challenger. Runderson, Hawkins and K.M. got out of the Audi. According to B.B., Runderson first talked to Brandon M. and then to Cortez C. B.B. stayed in the car and talked to K.M. through the driver side window. Brandon M. claimed he did not see Runderson get out of the Audi again after he talked to him at the Jack in the Box.

Brandon M. talked to Hawkins, whom Brandon M. had not seen until this point, and Hawkins asked him where he had been and why he had not been coming to Fresno to see him. Brandon M. asked Hawkins if he had a gun, and he said, "No."

Hawkins told Brandon M. he wanted his "L." Brandon M. asked Hawkins, "What's a L?" Two males then got out of the Audi and walked over to Brandon M. One of the individuals, who Brandon M. later identified as Jones, pointed a gun at Brandon M.'s face. The other individual, who had dreadlocks, took Brandon M.'s chain, wallet, money and cell phone. Hawkins stood there and, according to Brandon M., did not have a gun.

Brandon M. then pushed Jones, who was called "Bud", and the gun away from his face. When he did so, Jones shot Brandon M. on the side of his face. Brandon M. fell to the ground and pretended to be dead. When he fell, a pellet gun he had inside his pants fell onto the ground. B.B. and Cortez C. drove away in the Challenger. Shots were fired and bullets struck the vehicle.

Someone standing behind Brandon M. shot at him, and a bullet grazed his hip. Brandon M. did not see who shot him, but Jones, Hawkins, and another individual with dreadlocks, were all standing behind him. Brandon M. got up and ran and, as he did so, a bullet struck his left thigh.

6

Brandon M. ran to a house and asked for help. He was taken by ambulance to a hospital and subsequently had two surgeries on his face. At the time of trial, he was still in need of another surgery.

Brandon M. testified he thought Hawkins had "set everything up," because, while he was talking to Hawkins, he was "left … blind for the other guys to come in."

B.B. testified that she saw three people with guns. She thought Runderson had a gun, but she did not know for sure. According to B.B., a male with dreadlocks and a white shirt, whom she did not know, pointed a gun at Brandon M.

*Police Investigation*

Around midnight on March 27, officers responded to a call of gunshots and a shooting victim and found Brandon M. lying on the front porch of a house "bleeding heavily." Brandon M. told officers he had been shot by "two guys," he identified as Runderson and "D-Hawk."

A Challenger drove up with B.B. and Cortez C. inside. They had been looking for Brandon M. The Challenger had gunshot marks on the car.

B.B. told an officer that Brandon M. was supposed to meet someone to buy a grill, but she did not know who that person was and Brandon M. had directed her where to drive. B.B. told the officer three or four males got out of a light-colored vehicle and were involved in an altercation with Brandon M. One of those males reached out and grabbed Brandon M.'s chain. She also said one of the males pointed a gun at Brandon M., but she could not describe him because the other vehicles headlights were shining in her car's mirror. She did not see anyone else with a gun. Neither B.B. nor Cortez C. gave the officer a description of the males involved.

A blood trail from Brandon M. led to the location where officers discovered Brandon M.'s Airsoft gun and eight expended .380-caliber semiautomatic cartridge casings. A .177 Beretta was found in a nearby bush. An examination of the Challenger

7

revealed six bullet holes and two strike marks. Four bullets were recovered from the car's rear passenger side and trunk. A palm print on the Challenger's exterior passenger side rear quarter panel matched Jones's left palm. Officers searched Jones's house but did not find a dark-colored hoodie or jeans like the type Brandon M. described. A video from the Riverpark Target showed a car similar to Brandon M.'s, followed by a car similar to an Audi, exiting the parking lot.

Police Officer Melanie Mayo interviewed B.B. and Cortez C. the following day, March 28. B.B. was shown three photo lineups with Runderson in the first lineup and Hawkins in the second. B.B. did not identify either. Later, B.B. admitted that she knew Hawkins and Runderson after B.B. let Officer Mayo look at her cell phone. She said she had not told Officer Mayo Runderson and Hawkins were involved in the shooting and she was hesitant to speak because she thought she would be in physical danger.

On the evening of March 28, B.B. rode with K.M. to Bakersfield. The next day, B.B. called Officer Mayo and asked if they could meet. Officer Mayo interviewed B.B. two days later. During that interview, B.B. told Officer Mayo she had talked to Brandon M. and K.M. about the incident and she then said she had seen both Hawkins with a gun and Runderson pointing a gun at Brandon M. B.B. described Hawkins as wearing a white T-shirt and having "dreads." B.B. also said another person with longer dreadlocks was at the scene, but she was unable to provide a further description. B.B. said there were two other people at the scene she did not know, one of them was called "Bub." B.B. said the shooter was wearing something with a hood, but she did not see someone actually pull the trigger.

After speaking to B.B., Officer Mayo spoke to Brandon M., who had gauze bandages on his face, stitches down his neck, a "grazed" wound on his hip, and an injury to his calf. Brandon M. told Officer Mayo that the only conflict he had with Runderson and Hawkins was that they thought he had not been coming to Fresno as often as he used

to and that both may have been jealous of his success. Brandon M. did not say Runderson had a gun. He also had trouble remembering what Hawkins was wearing, but thought it was a black shirt.

Brandon M. described standing near his car talking to Hawkins, who he thought had a gun but he did not actually see one. Brandon M. asked Hawkins, who was grabbing the crotch area of his pants, "Are you clocking on me, bro?", to which Hawkins replied he was "just holding his shit." Hawkins then motioned with his hand, and two or three people got out of the Audi. Runderson stayed by the car.

Brandon M. said that Hawkins told the person who shot him, "Shoot him. Shoot him." The person who shot him was called "Bud" and was wearing a black jacket with a hood. Brandon M. said that it was Hawkins who went through his pockets and took his cell phone and wallet.

Brandon M. told Officer Mayo he thought the shooting had been a set up, and that Runderson had said to him, "You know me, bruh … I would have done it right then and there at the Jack-in-the-Box." Brandon M. did not explain what he thought that meant.

After talking to Brandon M., Officer Mayo reviewed notes from a prior investigation and discovered that an associate of Hawkins had a Facebook page under the name "Bub da Stunna." Officer Mayo determined that "Bub da Stunna" was Jones.

On April 1, Officer Mayo showed Brandon M. a photo lineup that included Jones, and Brandon M. identified him as the shooter.

Prior to testifying at trial, Brandon M. told an investigator with the district attorney's office that "he would not have been in this situation if he had not been hanging out or associating with gang members." Brandon M. said Runderson and Hawkins called themselves "Fly Boys, Friday Night Fly Boys, Saturday Night Fly Boys" because "they would fly around on Friday and Saturday nights … jacking [robbing] niggers." But at trial, Brandon M. insisted it was not a gang, but a clique.

9

*Gang Evidence*

Officer John Swanson, assigned to the Violent Crime Impact Team, was on duty on January 6, 2015, when he came into contact with a group of four individuals, Hawkins and Runderson being among them. "[A]t least one" of the individuals in the group was a Dog Pound gang member who was prohibited from being with other Dog Pound members. Officer Swanson did not elaborate further.

Detective Robert Fry testified as the prosecution's gang expert. Detective Fry was a gang detective for the Multi-Agency Gang Enforcement Consortium (MAGEC) and had been assigned to the Metropolitan Tactical Team for approximately a year and a half. Both his current and prior assignments, with the North Bureau Impact Team and the Violent Crime Team, involved gang contacts and investigations. Part of his MAGEC assignment was to identify gang members and investigate gang-related crimes.

After being assigned to MAGEC, Detective Fry attended a week-long training on gangs in San Diego and attended additional training in Fresno and Clovis. He had been the primary investigator or assistant in "no less than 500" gang-related investigations involving different gangs and involved in "no less than 700" gang-related arrests. Over the course of his career, Detective Fry had contact with "thousands" of gang members, and they would "[o]ccasionally" talk to him about gang culture. Detective Fry also spoke regularly to other officers and MAGEC detectives about their contacts with gang members to keep "current on trends regarding rivalries, alliances, where these certain gangs have moved to throughout Fresno." He also reviewed crime and police reports to keep up-to-date.

Detective Fry began investigating the Fly Boys after he was assigned this case and "reviewed hundreds and hundreds of police reports and field interview contacts prepared by officers and detectives within the department." Detective Fry opined that the Fly Boys were a criminal street gang consisting of approximately 35 members, who

10

"generally" wore Florida Marlins clothing and had a sign of the letter "F." According to Detective Fry, the Fly Boys claimed the 1600 block of South Crystal in Southwest Fresno and were part of the TWAMP alliance. Although the Fly Boys originally formed as a dance crew, it was "believed" they transformed into a street gang sometime between 2010 and 2012.

Detective Fry testified that some of the primary activities of the Fly Boys included illegal possession of firearms, possession of narcotics and narcotics for sale, robberies, assaults, attempted homicides, and burglaries. Detective Fry testified to specific offenses committed by Fly Boys gang members. The first involved James Green, a validated Fly Boy, who was convicted in 2012 of carrying a loaded firearm in public and possession of a controlled substance for sale. The second was for Jaquori Ford, a validated Fly Boy, who was convicted in November 2014 of illegal possession of a firearm. And the third was for Devon Randolph, a validated Fly Boy, convicted in 2012 of second degree robbery. Detective Fry formed his opinion that Green, Ford and Randolph were validated Fly Boys by reviewing multiple police reports and field interviews prepared by police officers, as well as reviewing social media. Detective Fry also took into consideration Officer Brandon Brown's earlier testimony at trial in which Officer Brown, who was assigned to the Southwest District Crime Suppression Team, came in contact with James Green on February 26, 2012. Hawkins was in the vehicle with Green at the time and was arrested but released. Officer Brown had also had previous contact with Runderson but had not arrested him. The criminal complaints as to Green, Ford, and Randolph were moved into evidence. Based on a review of these reports and court cases, and taking into consideration the current cases, Detective Fry opined that the Fly Boys were engaged in a pattern of criminal activity.

Detective Fry opined that Runderson, who was 20 years old at the time of the charged crimes, was a Fly Boy at the time of the offense. Detective Fry based his

11

opinion on Runderson's Facebook page and Instagram account photos. In one photo, posted in 2011, three people are shown, one of them being Runderson, who is displaying the Fly Boys gang sign. In another photo, Runderson and another individual are shown and Runderson is holding a firearm. Another photo, posted in 2014, shows Runderson displaying the Fly Boys' gang hand sign. And in another photo, also posted in 2014, Runderson is using both hands to make a "W," which stood for Westside and the "Fly Boys claim the Westside Fresno."

Detective Fry opined that Hawkins, who was 21 years old at the time of the charged crimes, had been a Fly Boys gang member since 2014. A photo from Hawkins's Facebook page shows him standing with a girl and the lettering "Fly'err" added to the photo. In two other photos, Hawkins is displaying the Fly Boys gang hand sign. In another photo, Hawkins is wearing a T-shirt that says, "Still Fly." And in still another photo, Hawkins is with two other individuals, and he is displaying the gang hand sign. Detective Fry personally retrieved the photos from Hawkins Facebook page in May of 2015.

Detective Fry opined that Jones, who was 16 years old at the time of the charged crimes, was a Fly Boys gang member based on photographs found on his social media accounts. In one photo of Jones, the word "gang" is inserted. In another photo, Jones is with four other individuals, and Jones and others are displaying the Fly Boys gang sign. Jones is wearing a hat with the letter "T" for "teamin," which the Fly Boys use as a symbol, and another individual is wearing a Florida Marlins hat. Detective Fry recognized two of the individuals with Jones as Fly Boys. In another photo, Jones is depicted with two other individuals, and Jones is displaying the Fly Boys gang hand sign. In another photo, Jones is depicted with six other subjects, who are all displaying the Fly Boys gang hand sign. In another photo, Jones is shown displaying the Fly Boys gang sign, wearing gang attire, and in front of Jones's shirt is inserted a picture of California

12

and the word "sunset," which Detective Fry stated referred to the 1600 block of South Crystal, in the sunset neighborhood. There is also a "W" in the photo, which stands for Westside, and the block numbers 1600 on the back of a shirt, for the 1600 block of South Crystal Fly Boys gang territory. And in another photo, Jones is shown displaying the Fly Boys hand gang sign and wearing a hat with the letter "T" to represent "teamin." And in another photo, Jones and another individual are depicted with their right arms raised and extended forward, their hands in a fist and their arm and hand pointed at the camera. And in another photo, Jones and Hawkins appear together and Jones is displaying a Fly Boys hand sign.

In determining gang membership, Detective Fry also considered a photograph of Runderson, Hawkins and Jones, along with two unidentified males, one of whom is making a Fly Boys gang sign, and the photo is captioned "Us young niggazzz run da block now, # gang." Detective Fry stated that the testimony of Officer Swanson, recalling an encounter with, among others, Hawkins and Runderson, was also important in forming his opinion, as the two were with two other known gang members. Officer Mayo had previously testified about the photo, which she received from Jones's Facebook page.

Detective Fry testified on the importance of respect to a gang and that they earn respect by committing violent crimes and intimidating the public and the neighborhood. Posed with a hypothetical question that mirrored the facts of the case, Detective Fry opined that the crimes were committed in association with a street gang with the intent to promote, further or assist criminal activity by gang members.

Officer Mayo also testified as a gang expert and was assigned to the street violence section but was previously with MAGEC. While at MAGEC, she attended a week-long detective school hosted by the Los Angeles County Sheriff's Department, and also attended monthly training classes involving gang investigations. She also was

13

involved in "over 500 investigations" involving various gangs, information that was shared with other detectives. In her current assignment she often came into contact with gang members and talked to them about gang culture. Officer Mayo was also familiar with Westside African-American gang activity in Fresno.

Officer Mayo testified the Fly Boys began as a dance crew at Edison High School in 2010 and changed into a criminal gang sometime between 2010 and 2012. According to Officer Mayo, Fly Boys members and associates were not limited to individuals who had attended Edison High School, but Hoover and Bullard High Schools as well. Officer Mayo validated the Fly Boys as a criminal street gang for the Fresno Police Department in February 2015, just prior to the current crimes, but stated it would be "necessary for it to exist before" it is recognized. Officer Mayo cited the unsolved 2012 killing of Fly Boy Jerontae Laney as something that became a "symbol" for the other Fly Boys and established alliances and rivalries between the TWAMP and MUG alliances, but she did not elaborate further. Officer Mayo testified that Stockton "also" "seems" to have a validated Fly Boys criminal street gang.

Officer Mayo opined that Hawkins and Jones were Fly Boys members and Runderson was a Fly Boys associate. Officer Mayo found "many" references to Fly Boys on Hawkins Facebook page during a prior investigation. In part, Officer Mayo recognized Jones from a brief Fly Boys rap video which she discovered when searching on YouTube for "anything that had the name Fly Boys in it." A still photo from the video showing Jones was moved into evidence.

<u>Defense</u>

*Runderson's Defense*

Runderson's father, Granville Runderson, (hereafter Granville, for purposes of clarity) testified he had heard of the Fly Boys but knew that Runderson had not been involved with the group in 2010 because Granville was involved in youth activities in the

14

area.  The only Fly Boys Granville knew of went to Edison High School, and in 2010 Runderson was in junior high.

Granville testified Hawkins and Runderson were cousins on Runderson's mother's side.  Granville had coached Hawkins in football, and Hawkins had often been at their house.  Hawkins had never mentioned the Fly Boys.

Runderson later attended Edison High School with Hawkins and the two played football.  After he graduated, Runderson played football at San Jose City College and then transferred to Fresno his second year.  At the time the crimes occurred, Runderson was attending college and working at RLF Print Shop, in which Granville was part owner.  Granville testified that Runderson worked "from in the morning until probably late at night."  Granville did not think Runderson was at any time associated with the Fly Boys and he took Runderson to the police station after he learned about the shooting and officers came to his house.

According to Granville, the photographs found on Runderson's Facebook page had been taken "at least five years" ago.  In three of the photos, Runderson was with his cousins.  The "W" hand sign Runderson was making was "just basically saying Westside, for the west side community."  In another photo, Runderson was holding what Granville described as a fake gun.  After Granville learned the photo had been posted, he took that gun away from Runderson.  The other gun in the photo was a BB gun that Granville also took away from Runderson and his cousin.

*Hawkins's Defense*

Victim B.B. testified on Hawkins's behalf.  She acknowledged that, during her March 28 interview with Officer Mayo, she said she knew Hawkins and Runderson and let Officer Mayo look at her phone, which had Hawkins's contact information.  B.B. acknowledged that she spoke to K.M. prior to the interview and "may have" told Officer Mayo some of the things K.M. had said, but she did not remember.

15

Prior to the shooting, B.B. was sitting in the driver's seat of the car and K.M. was leaning in the window talking to her. The rest of the individuals were on the passenger side of the vehicle and lights shining in the car's mirrors affected B.B.'s ability to see.

B.B. testified that she felt uneasy at the final stop, and she began to drive away before Brandon M. got out of the car. She may have but did not remember if she told Brandon M. that she did not recognize the person who got out of the Audi. B.B. did not remember Brandon M. grabbing the steering wheel when she tried to drive away.

According to B.B., she first saw Hawkins on the night in question at the final location. She had been driving Brandon M. and the others between 30 minutes to an hour before the crimes occurred. B.B. started to get an "uneasy feeling at the second Target" before she ever saw Hawkins.

*Jones's Defense*

Jones's mother, Shonda Gant, testified that they did not live near Edison High School and she was not aware of any criminal street gangs in the neighborhood. She was not concerned about Jones getting involved in a criminal street gang.

Gant knew Hawkins, who had been to their house, but she had not seen him making any unusual hand signs. Gant did not know Runderson.

Gant saw Jones the morning of March 27 before he went to school. That night, Gant planned to get together with her two sisters for a monthly dinner at one of their homes, but she was not feeling well and cancelled at 7:15 p.m. Jones had come home three or four minutes before Gant made the call. The dinner date was written on her calendar.

Gant had a rule that Jones had to be home at 7:30 p.m., and no later than 8:00 p.m., because "there's so much going on now …." Jones disobeyed curfew once and was disciplined.

16

When Jones got home, he was acting normally and was not wearing a dark hoodie sweatshirt. According to Gant, Jones did not have a dark hoodie sweatshirt. She also testified he did not leave the house that night and could not have snuck out.

Gant was shown photos introduced during Detective Fry's testimony. Gant acknowledged buying Jones some of the clothing he was wearing in the photos. Gant did not recognize the hand sign Jones was making in one of the photos. Gant insisted that Jones did not point his middle finger in her presence like he was doing in one of the photos.

## DISCUSSION

### I. SUFFICIENCY OF EVIDENCE ON THE GANG ENHANCEMENTS

Appellants first challenge the sufficiency of the evidence supporting the jury's gang enhancement findings. They contend the evidence was insufficient to show the existence of a criminal street gang within the meaning of section 186.22, subdivision (e) as an "ongoing organization," or that members of the alleged criminal street gang "engaged in a pattern of criminal gang activity" required under section 186.22, subdivision (f). Appellants also claim the evidence was insufficient to establish that any of them committed the charged offenses "for the benefit of, at the direction of, or in association with any criminal street gang," and "with the specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of section 186.22, subdivision (b). While the evidence to support the gang enhancement was not overwhelming, it was sufficient to uphold the findings.

#### A. Standard of Review

"When we review a challenge to the sufficiency of the evidence to support a conviction we apply the substantial evidence standard. Under that standard the reviewing court examines the entire record to determine whether or not there is substantial evidence from which a reasonable jury could find beyond a reasonable doubt that the crime has

17

been committed.  In reviewing that evidence the appellate court does not make credibility determinations and draws all reasonable inferences in favor of the trial court's decision. We do not weigh the evidence but rather ask whether there is sufficient reasonable credible evidence of solid value that would support the conviction.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576–578.)"  (*People v. Russell* (2010) 187 Cal.App.4th 981, 987–988.)  The jury's finding on enhancement allegations are reviewed under the same standard.  (*People v. Rivera* (2019) 7 Cal.5th 306, 331.)

B.  Overview of Governing Law

The Legislature enacted the California Street Terrorism Enforcement and Prevention Act expressly "to seek the eradication of criminal activity by street gangs." (§ 186.21.)  One component of the statute is a sentence enhancement for felonies committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)

A "criminal street gang" is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [§ 186.22, subd. (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (§ 186.22, subd. (f).)  A "pattern of criminal gang activity" may be established by proving that gang members committed, attempted commission of, or were convicted of, two or more enumerated offenses, known as predicate offenses (§ 186.22, subd. (e).)

"Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; … the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and

18

how a crime was committed to benefit or promote a gang.' [Citation.]" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120.)

C. <u>Evidence to Establish the Fly Boys as an Ongoing Organization, Association or Group</u>

In this case, the prosecution proceeded on the theory that the Fly Boys were a criminal street gang. Appellants contend there is insufficient evidence that the gang even existed. To establish that a gang is a "criminal street gang" within the meaning of the gang enhancement statute, the prosecution must prove, among other elements, that the gang is an "ongoing organization, association, or group of three or more persons, whether formal or informal, ... having a common name or common identifying sign or symbol ...." (§ 186.22, subd. (f).) While a "formal group" may often reflect well-defined membership criteria, a discernible hierarchy, predictable meeting schedules and locations, fixed membership groups, and codified rules and order, an "informal group" will rarely if ever display these characteristics. (*People v. Prunty* (2015) 62 Cal.4th 59, 73 (*Prunty*).) An informal group "need not exhibit an identifiable hierarchy; their membership composition may be fluid; their boundaries of the their 'turf' may be porous; and their methods of communication may be variable." (*Ibid.*) However, an "organization, association, or group" must be more than "three or more persons, … having a common name or common identifying sign or symbol," and there must be "a degree of physical togetherness or the engagement in common activities …." (*Id.* at p. 75.)

Here, Detective Fry, who "reviewed hundreds and hundreds of police reports and field interview contacts prepared by officers and detectives within the department," opined that the Fly Boys were a criminal street gang consisting of approximately 35 members, who "generally" wore Florida Marlins clothing and had a hand sign of the letter "F." According to Detective Fry, the Fly Boys claimed the 1600 block of South Crystal in Southwest Fresno and were part of the TWAMP alliance. Although the Fly

19

Boys originally formed as a dance crew, it was "believed" they transformed into a street gang sometime between 2010 and 2012.

Officer Mayo also testified that the Fly Boys began as a dance crew at Edison High School in 2010 and changed into a criminal gang sometime between 2010 and 2012. According to Officer Mayo, Fly Boys members and associates were not limited to individuals who had attended Edison High School, but Hoover and Bullard High Schools as well. Officer Mayo validated the Fly Boys as a criminal street gang for the Fresno Police Department in February 2015, just prior to the current crimes, but that it would be "necessary for it to exist before" it was recognized.

The testimonies of Detective Fry and Officer Mayo provided sufficient evidence from which a reasonable juror could find that the Fly Boys were an "organization, association, or group," that consisted of "three or more persons," whether "formal or informal," with "a common name or common identifying sign or symbol." (§ 186.22, subd. (f); *Prunty, supra,* 62 Cal.4th at p. 75.)

D. Evidence to Establish the Primary Activities of the Fly Boys

To prove that a gang is a "criminal street gang," the prosecution must also show, in part, that the gang has as one of its "primary activities" the commission of one or more of the crimes enumerated in section 186.22, subdivision (e). (§ 186.22, subds. (e), (f).) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," as opposed to the occasional commission of those crimes by one or more of the group's members. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently* and *repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang

20

members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465.)

Appellants contend Detective Fry's testimony was insufficient to prove the primary activities of the Fly Boys street gang because he failed to provide any foundation for his opinion, and instead simply gave a vague, conclusory recitation of crimes allegedly committed by the gang. The record reflects Detective Fry testified about his own background, training, and experience in investigating criminal street gangs, including the Fly Boys gang. At the time of trial, Detective Fry had been a police officer for 10 years, and both his current and past assignments involved gang contacts and investigations. He had been the primary investigator or assistant in "no less than 500" gang-related investigations and "[n]o less than 700" gang-related arrests. In his contacts with various gang members, other officers, and in reviewing crime reports, he stayed current on trends regarding gang rivalries and alliances. He acknowledged he had become aware of the Fly Boys street gang only after he was assigned to the current case. But once assigned, he reviewed "hundreds and hundreds" of police reports and field interview contacts prepared by officers and detectives within the department. At trial, Detective Fry was asked if he was familiar with "some of the Fly Boys' primary activities," and he replied he was. When asked what some of those primary activities were, Detective Fry responded, "Illegal possession of firearms, possession of narcotics and possession of narcotics for sales, robberies, assaults." When asked if there were additional crimes, he responded, "Yes. Attempted homicides and burglaries." He responded "Yes" when asked if he had reviewed reports and court cases associated with these activities.

Under these circumstances, appellants' reliance on *In re Alexander L.* (2007) 149 Cal.App.4th 605, is misplaced. In that case, the appellate court reversed a true finding on

a gang enhancement on the ground that the gang expert's testimony was insufficient to establish the primary activities element. When asked about the primary activities of the defendant's gang, the expert testified, "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id.* at p. 611.) However, the expert did not explain the basis for his knowledge and conceded on cross-examination that the vast majority of crimes involving the gang were graffiti-related. (*Id.* at pp. 611–612.)

In *People v. Margarejo* (2008) 162 Cal.App.4th 102, the expert was asked what the "primary activities" of the gang were, and he responded that "[t]heir *activities* range from simple vandalism and battery, and can extend all the way to murder. They also include consolidated weapons, carjacking, robberies and a lot of narcotic related offenses." (*Id.* at p. 107.) The *Margarejo* court rejected the defendant's argument that there was no testimony on the gang's "primary activities" because the expert did not repeat the word "primary" in his answer, reasoning "the jury had ample reason to infer that [the expert's] answer implicitly incorporated the word 'primary' from the question." (*Ibid.*) In reaching its conclusion, the court in *Margarejo* contrasted the expert testimony in *Alexander L.,* reasoning that it was insufficient to support a gang enhancement finding because the witness did not identify the gang's primary activities, equivocated on direct examination, and contradicted himself on cross-examination. (*Margarejo, supra,* at p. 107.) Detective Fry's testimony, in contrast, did not suffer from the deficiencies enumerated in *Alexander L.* and is more akin to those in *Margarejo*. When considered as a whole, Detective Fry's testimony was sufficient to establish the primary activities element of the gang enhancement statute.

E.  Evidence to Establish the Fly Boys' Pattern of Criminal Gang Activity

To prove the existence of a "criminal street gang" within the meaning of the gang enhancement statute, the prosecution must also establish that the gang's members "individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, subd. (f).)   A " 'pattern of criminal gang activity' " means "the commission of, attempted commission of, conspiracy to commit, ... or conviction of two or more of the [enumerated] offenses, provided ... the offenses were committed on separate occasions, or by two or more persons" within a statutorily defined time period. (§ 186.22, subd. (e).)  These are commonly referred to as "predicate offenses."

To establish that the Fly Boys engaged in a *pattern of criminal gang activity* with these predicate offenses, Detective Fry testified to the following specific offenses committed by what he claimed were validated Fly Boys gang members: The first involved James Green, convicted of possession of a controlled substance for sale committed on February 26, 2012.  The second also involved James Green, convicted of carrying a loaded firearm in a public place, committed on January 19, 2012.  The third involved Jaquori Ford, convicted of illegal possession of a firearm committed on November 20, 2014.  And the fourth involved Devon Randolph, convicted of second degree robbery committed on October 25, 2012.  The prosecution introduced certified court documents reflecting these convictions.

Appellants argue Detective Fry's testimony was insufficient to prove the predicate offenses required to establish a pattern of criminal gang activity because Detective Fry lacked personal knowledge of any of the offenses, and instead based his testimony on second-hand information obtained from police reports and other officers.  In part II., below, we consider whether Detective Fry's testimony concerning the predicate offenses related testimonial hearsay in violation of the Evidence Code and the Sixth Amendment confrontation clause.  However, for purposes of assessing the sufficiency of the evidence

to support the jury's gang enhancement findings, we consider all of the evidence presented at trial, including any evidence that should have been excluded. (*People v. Story* (2009) 45 Cal.4th 1282, 1296 ["when reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, the reviewing court must consider *all* of the evidence presented at trial, including evidence that should not have been admitted"]; see also *People v. Lara* (2017) 9 Cal.App.5th 296, 328, fn. 17, 335–337 [appellate court must consider all evidence presented, including improperly admitted testimonial hearsay, in deciding whether evidence was sufficient to support gang enhancement findings.])

Here, the certified court records offered by the prosecution, along with Detective Fry's testimony, was sufficient to support a finding that members of the Fly Boys gang, individually or collectively, engaged in a pattern of criminal gang activity. The court records showed convictions for at least two statutorily enumerated offenses committed on separate occasions by two or more persons within a three-year period. (§ 186.22, subd. (e).) Detective Fry opined that the individuals who committed the predicate offenses—Green, Ford and Randolph—were members of the Fly Boys' street gang at the time of their crimes. In explaining the basis for his opinion, Detective Fry stated that he relied, in part, on his review of police records and his conversations with other officers. Based on the totality of the evidence presented at trial, the evidence was sufficient to establish the predicate offenses necessary to prove the pattern of criminal gang activity element of the gang enhancement statute.

F. Evidence to Establish the Charged Offenses were Gang-Related and Committed with the Specific Intent to Assist Criminal Conduct by Gang Members

To obtain a true finding on a gang enhancement allegation, the prosecution must also prove the charged offense was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or

24

assist in any criminal conduct by gang members ....” (§ 186.22, subd. (b)(1).) The gang enhancement thus applies “when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang.” (*People v. Albillar* (2010) 51 Cal.4th 47, 68 (*Albillar*).) To establish this element of the statute, “the prosecution may ... present expert testimony on criminal street gangs.” (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.) “ ‘Generally, an expert may render opinion testimony on the basis of facts given “in a hypothetical question that asks the expert to assume their truth.” [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence....’ ” (*People v. Ward* (2005) 36 Cal.4th 186, 209.) While an expert may not ordinarily testify whether the defendant committed a particular crime for the benefit of a gang or with the specific intent to facilitate criminal conduct by gang members, the expert “properly could ... express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose.” (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

Appellants contend there was no testimony as to how long they had been members or what position each held within the gang. They note none had prominent gang tattoos signifying their gang affiliation. And they contend the offenses were not gang-related, or intended to aid any criminal conduct by gang members, since the spot where the shootings took place was a random location, there was no evidence of a gang rivalry between the offenders and the victims (in fact, there was evidence that the victim B.B. herself could have been a Fly Boys associate), and there was no evidence appellants called out any gang names, or otherwise announced their gang affiliation during the offense.

However, there was evidence connecting the attempted murder and assaults committed by appellants to the Fly Boys gang. The jury heard evidence appellants were members of the gang: Hawkins and Jones as Fly Boys members and Runderson as a Fly

25

Boys associate. Detective Fry testified that gangs "work off of respect," which they earn by committing violent crimes and intimidating the public and the neighborhood. Detective Fry went on to explain that,

> "When a gang member commits a violent crime and they post that on social media, that causes fear to the public, whoever is viewing the photos. When a gang is in a certain neighborhood, they gain respect from the citizens in that neighborhood, from the public. When the neighborhood and the public see these gang members congregating together in large groups, displaying gang hand signs, it causes fear and intimidation to the public, therefore, these citizens are in fear to report criminal activity by these gang members, they're in fear to report that to law enforcement."

Given that the attempted murder and assaults involved three Fly Boys gang members acting in concert, the jury reasonably could have concluded that it was committed with the specific intent to promote, further, or assist criminal conduct by members of that gang. (*Albillar, supra,* 51 Cal.4th at p. 68 ["if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members"]; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 ["[c]ommission of a crime in concert with known gang members ... supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime"].)

The jury also heard Detective Fry's expert testimony, based on a hypothetical drawn from the evidence in this case, that the offenses would have been committed with the intent to promote, further or assist criminal activity by gang members. He explained his opinion was based on the fact that the three acted in concert, and they had previously identified themselves to Brandon M. as Fly Boys and "gave a reason why, because they go around jacking people." Detective Fry explained that, in this situation, appellants acted together and carried out a plan, which causes fear to the victim "as well as other people who are aware of this case," and allowing the gang to "gain more respect." An

26

"[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[ ] criminal street gang' "].) (*Albillar, supra,* 51Cal.4th at p. 63.)

Based on the totality of this evidence, the jury reasonably could conclude that appellants committed the charged offenses for the benefit of, at the direction of, or in association with the Fly Boys street gang, and with the specific intent to promote, further, or assist in criminal conduct by its members.

The jury's true findings on the gang enhancement allegations were therefore supported by substantial evidence.

## II.     ADMISSIBILITY OF THE GANG EXPERT TESTIMONY

Appellants next contend that, under the California Supreme Court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), which was decided shortly after trial in this case, the admission of Detective Fry's expert testimony violated California hearsay law and the Sixth Amendment right of confrontation. Appellants claim Detective Fry improperly related case-specific, testimonial hearsay in testifying on the predicate offenses required to establish the pattern of criminal gang activity element of the gang enhancement statute. Based on the legal principles set forth in *Sanchez*, we concluded in our majority opinion that the trial court erred in admitting Detective Fry's hearsay testimony identifying each of the predicate offenders as validated Fly Boys gang members, and that the error was not harmless under the circumstances of this case.

On June 30, 2020, the People filed a petition for review in the California Supreme Court (S263068) on the issue of whether a gang expert's testimony on predicate offenses is background or rather case specific information. The Supreme Court granted review and deferred briefing until the high court decided *Valencia, supra,* 11 Cal.5th 818, in which it held that a gang expert's testimony at trial on predicate offenses under section

27

186.22 must be proved by independently admissible evidence and not solely by the testimony of an expert with no personal knowledge of facts of the offenses. (*Valencia, supra,* at p. 839.) On September 15, 2021, the Supreme Court transferred this case back to this court with directions to vacate our opinion and to reconsider in light of *Valencia*. We do so now and reaffirm our earlier reversal of the jury's true finding on the gang allegation.

A. *Sanchez* and *Valencia*

The *Sanchez* opinion held that a gang expert cannot testify to case-specific facts asserted in hearsay statements unless such facts are within the expert's personal knowledge or independently supported by admissible evidence. A significant portion of Detective Fry's testimony contained inadmissible hearsay, which we conclude was not harmless.

"Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108, citing Evid. Code, § 1200.) The right of confrontation, as guaranteed by the Sixth Amendment to the federal Constitution and made applicable to the states through the Fourteenth Amendment, ensures the opportunity for cross-examination of adverse witnesses. (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.) In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that the confrontation clause bars admission of out-of-court testimonial hearsay statements unless the declarant is unavailable and the defendant had a previous opportunity for cross-examination. (*Id.* at p. 59.)

Prior to *Sanchez*, expert witnesses could testify about out-of-court statements upon which they had relied in forming their opinions, even if the statements were otherwise inadmissible under the hearsay rule. Case law held such evidence was not offered for its truth, but only to identify the foundational basis for the expert's testimony. (E.g., *People*

28

*v. Gardeley* (1996) 14 Cal.4th 605, 618–620 (*Gardeley*), disapproved on other grounds in *Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13; *People v. Miller* (2014) 231 Cal.App.4th 1301, 1310.) Pursuant to this rationale, appellate courts deemed the use of out-of-court statements in an expert witness's "basis testimony" to be compliant with the hearsay rule and the requirements of *Crawford.* (*People v. Valadez* (2013) 220 Cal.App.4th 16, 30.)

The *Sanchez* opinion held that a trier of fact must necessarily consider expert basis testimony for its truth in order to evaluate the expert's opinion, which implicates the hearsay rule and the Sixth Amendment right of confrontation. (*Sanchez, supra,* 63 Cal.4th at p. 684.) "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.... If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686, fn. omitted.)

"The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Sanchez, supra,* 63 Cal.4th at p. 676.) However, the hearsay rule does apply to testimony regarding "*case-specific* facts," meaning "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) Unless subject to a statutory exception, such hearsay is inadmissible under state law. (*Id.* at pp. 674, 698; Evid. Code, § 1200, subd. (b).)

Federal constitutional issues arise if case-specific facts are presented in the form of testimonial hearsay. (*Sanchez, supra,* 63 Cal.4th at pp. 680–682, 685.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony." (*Id.* at p. 689.) Information contained in a police report is generally construed as testimonial hearsay because police reports

29

"relate hearsay information gathered during an official investigation of a completed crime." (*Id.* at p. 694.)

In our original opinion we acknowledged a split of authority regarding whether a gang expert's testimony about predicate offenses entails "case-specific facts" as contemplated by *Sanchez*. One view held that evidence of a pattern of criminal activity by alleged gang members should be classified as "general background information" and thus treated as subject matter about which a qualified expert may relate hearsay. (*People v. Blessett* (2018) 22 Cal.App.5th 903, 943–945, review granted Aug. 8, 2018, S249250; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1174–1175 [predicate acts are background information rather than case-specific facts].) The opposing perspective is that facts related to predicate offenses are necessarily case specific. (*People v. Lara, supra,* 9 Cal.App.5th at p. 337; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 583, 588–589.) Our majority opinion endorsed the latter view, which has now been affirmed by the recent opinion in *Valencia* disapproving the former view. (*Valencia, supra,* 11 Cal.5th at pp. 838-839, fn. 17.)

In *Valencia,* our Supreme Court reaffirmed, as observed in *Sanchez, supra,* 63 Cal.4th at page 698, that an expert may give "general testimony about a gang's behavior, history, territory, and general operations" as well as "the gang's name, symbols, and colors. All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang." (*Valencia, supra,* 11 Cal.5th at p. 838.) However, "[s]uch information stands in contrast to information regarding the commission of a particular offense on a specific occasion" and what an expert cannot do is relate true case-specific facts asserted in hearsay statements, unless they are independently proved by competent evidence or are covered by a hearsay exception. (*Ibid.*) In *Valencia, supra,* 11 Cal.5th at pages 838–839, a police gang expert "testified regarding the facts of three predicate offenses" but

30

his "only knowledge of these offenses came from conversations with other officers and a review of police reports." (*Id.* at p. 827.)

B. Testimony on Predicate Offenses

Detective Fry related certain information to the jury he had learned from, and believed to be true based upon, his review of police reports, field interviews, and conversations with other police officers. His testimony included hearsay relating to the existence of a specific criminal street gang, i.e., the Fly Boys. To better frame the issue, we note again that a criminal street gang is defined as "any ongoing organization, association, or group of three or more persons ... whose members individually or collectively engage in or have engaged in a *pattern of criminal gang activity*." (§ 186.22, subd. (f), italics added.) "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.'" (*People v. Zermeno* (1999) 21 Cal.4th 927, 930.) The list of qualifying predicate offenses is found in section 186.22, subdivision (e)(1)–(33).

As noted previously, to satisfy the first element of the predicate offenses requirement, the prosecutor introduced People's exhibits Nos. 47, 48, 49 and 50. Exhibit No. 47 is a felony complaint, plea agreement form, and minute order for someone named James Green, who pled no contest to possession for sale of a controlled substance (Health & Saf. Code, § 11378), committed on February 26, 2012, a qualifying offense under the gang statute. (§ 186.22, subd. (e)(4).) Exhibit No. 48 is a felony complaint, plea agreement form, and minute order, also for James Green, who pled no contest to concealing a firearm in a vehicle (§ 25400, subd. (a)(1)), committed on January 19, 2012, a qualifying offense under the gang statute. (§ 186.22, subd. (e)(32).) Exhibit No. 49 is a felony complaint, plea agreement form, and minute order for someone named Jaquori

31

Ford, who pled no contest to possession of a firearm with a probation restriction (§ 29815, subd. (a)), committed on November 20, 2014, a qualifying offense under the gang statute. (§ 186.22, subd. (e)(31).) And exhibit No. 50 is a felony complaint, plea agreement form, and minute order for someone named Devon Randolph, who pled no contest to one count of second degree robbery (§ 211) and one count of grand theft from a person (§ 487, subd. (c)), committed in October of 2012, both of which are qualifying offenses under the gang statute.[5] (§ 186.22, subd. (e)(2) and (9).) Other than the fact that the predicate offenses occurred, Detective Fry did not testify to any of the specifics of the offenses. It is undisputed that the crimes committed by Green, Ford and Randolph took place within the statutory period and occurred within three years of each other.

The second element of the predicate offenses requirement is that the predicate offenses be committed by members of the subject gang. (*Gardeley, supra,* 14 Cal.4th at pp. 621–622.) Detective Fry was asked if, "based on [his] research," each of the three men was a validated Fly Boys gang member. He answered affirmatively on each. Detective Fry stated that, in determining Green was a Fly Boy, he had reviewed "multiple police reports" "as well as reviewing social media." Detective Fry's information and belief regarding Ford's alleged gang membership was based on his review of "numerous police reports," "field interviews," and "viewing photos from social media." And as for Randolph, Detective Fry explained that his belief in his Fly Boys gang status was based on "my investigation of him, reviewing multiple police reports and field interviews prepared by Fresno Police officers, as well as reviewing social media."

The record is unclear in terms of whether or to what extent, if any, Detective Fry had any personal knowledge of Green, Ford or Randolph's purported membership in the Fly Boys. Detective Fry did not claim to have been involved in the investigation of any

---

[5] Detective Fry did not mention the grand theft conviction in his testimony.

32

of the crimes he testified to. And, in fact, he testified that he knew about the Fly Boys as a gang only after he was "assigned this case." He did not elaborate on what he meant by "reviewing social media," and he also acknowledged he had never arrested a Fly Boys member, had interviewed none, and only spoken to "several." Detective Fry offered no independent evidence that Green, Ford or Randolph were Fly Boys gang members.

In this case, Detective Fry was relying on the fact the predicate offenses were committed by Fly Boys derived entirely from hearsay sources—police reports, field interviews, social media, and conversations with other police officers, implying he had no personal knowledge of the underlying fact. " 'What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception.' " (*Valencia, supra,* 11 Cal.5th at p. 838, citing *Sanchez, supra,* 63 Cal.4th at p. 686.)

Detective Fry's testimony about the predicate offenses entailed "case-specific facts," not only because the evidence related to the second element of the gang enhancement charges, namely the gang membership of the predicate perpetrators, but also because appellant Hawkins, by inference, was alleged to have had peripheral involvement in the February 26, 2012, incident involving Green. At trial, prior to Detective Fry's testimony, Officer Brandon Brown testified he was assigned to the Southwest District Crime Suppression Team on February 26, 2012, when he observed Green, who approached a vehicle in which appellant Hawkins was sitting. This date coincides with the first predicate offense committed by Green that Detective Fry testified to. Officer Brown did not identify Green as a Fly Boys gang member and did not elaborate further. But Detective Fry considered Officer Brown's testimony in determining that Hawkins was a Fly Boys gang member, stating, "Detective Brown had contacted Donte Hawkins, and at that time, Donte Hawkins was with James Green, who is a validated gang member."

33

In summary, the crimes reflected in certified conviction records, exhibits Nos. 47, 48, 49 and 50, were used to establish the first element of the predicate offenses requirement for the gang enhancement allegations. However, without Detective Fry's inadmissible hearsay testimony, the jury had no basis upon which satisfy the second predicate offense element and to conclude at least two of those crimes were committed by members of the Fly Boys, leaving an evidentiary gap in the People's theory of liability. (E.g., *People v. Vasquez* (2016) 247 Cal.App.4th 909, 922 ["'The existence of a criminal street gang street gang is unquestionably an element of…the enhancement'"].)

Finding much of Detective Fry's testimony inadmissible, we nonetheless consider whether other admissible evidence was sufficient to support the jury's findings that Green, Ford or Randolph were gang members at the time of the offenses and find that it is not.

At trial, Officer Mayo testified to a photograph, exhibit No. 38, in which appellant Jones is pictured with four others. In the photograph, Jones is "displaying the gang hand sign used by the Fly Boys," and wearing a black hat with the letter "T" for "teamin," used by the Fly Boys as a symbol. Officer Mayo testified that the others in the photograph were also displaying the gang hand sign, and one individual is wearing a Florida Marlins hat. Officer Mayo testified that she recognized two of the others with Jones as Fly Boys but did not identify them.

When asked about exhibit No. 38, Detective Fry identified Ford as one of the individuals in the photograph, "on the bottom left," wearing a baby blue basketball hat, which Detective Fry testified "appear[ed]" to be a Texas Ranger's hat. He later corrected himself and stated it was a "San Jose Sharks" hat, which did not have gang significance for the Fly Boys.

Officer Mayo also testified that, in her investigation, she saw three or four YouTube videos related to the Fly Boys. She was able to take a "still" on one video.

34

Officer Mayo was not able to say when the video was taken. The still photograph, exhibit No. 25, showed five black males, one of whom Officer Mayo identified as appellant Jones, and was in the video for "[m]aybe three or four" seconds. The video included singing, rapping and dancing. Officer Mayo "believe[d]" one of the other individuals in the photograph was Randolph.

This scant evidence of gang membership on the part of Ford and Randolph was not sufficient to identify them as Fly Boys. And there was not admissible evidence on Green's identity as a Fly Boy.

The People also argue that, if Detective Fry's testimony about Green, Ford and Randolph is not considered to find the necessary predicate offenses, the current charged crimes of attempted murder and assault with a deadly weapon, committed by appellants, which are also qualifying offenses under section 186.22, subdivision (e)(1), are sufficient to find the requisite predicate acts. We disagree.

Appellants were charged with a gang enhancement, section 186.22, subdivision (b)(1), which enhances the sentence of any person convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, but does not require that the person be a member of a gang. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138–1139; *Albillar, supra,* 51 Cal.4th at pp. 67–68.) However, to show a pattern of criminal activity, the predicate offenses required to find the enhancement true must be committed by members of the subject gang. (*Gardeley, supra,* 14 Cal.4th at pp. 621–622.) Thus, while the currently charged crimes may qualify as predicate offenses, and so may a defendant's prior conviction, this is so only if the jury concludes the defendant is a gang member. (*People v. Tran* (2011) 51 Cal.4th 1040, 1046.)

Here, Detective Fry, when asked if he had taken the "current case" into consideration in forming his opinion that the Fly Boys engaged in a pattern of criminal activity, Detective Fry replied, without elaboration, "Yes, I have."

35

In closing, the prosecution told the jury it could find a pattern of criminal activity based on the charged crimes alone. The prosecutor argued, in part,

"Now there were several instructions that judge read related to the pattern of criminal activity. But what does it all really mean? What it boils down to is, is there evidence that two of the listed crimes were committed, either by two separate gang members during the same incident or by the same gang member on two separate occasions? [¶] Well, we have testimony from Detective Fry where there were four prior convictions, two by one individual, the other two by different individuals, all of whom he testified as to were gang members of the Fly Boys, or we have this case alone, where we have three individuals committing multiple of the listed offenses."

The jury was instructed that it could rely on the charged crimes to prove a pattern of criminal activity, as follows:

"A 'pattern of criminal gang activity,' as used here, means: [¶] 1. The commission of, or conviction of any combination of two or more of the following crimes or two or more occurrences of one of more of the following crimes: unlawful possession of a firearm, possession for sale of narcotics, robbery, grand theft, assault with a firearm, attempted murder; [¶] 2. At least one of those crimes was committed after September 26, 1988; [¶] 3. The most recent crime occurred within three years of one of the earlier crimes; [¶] AND [¶] 4. The crimes were committed on separate occasions or were personally committed by two or more persons."

However, in the same instruction, the jury was also told that, "The People need not prove that the defendant is an active or current member of the alleged criminal street gang."

Thus, the jury was never instructed, and it was not argued, that it had to find Runderson, Hawkins or Jones to be a gang member if it was relying on the current crimes in order to find the pattern of criminal gang activity element of the enhancement true.

C. No Harmless Error

The erroneous admission of testimonial hearsay is reviewed for prejudice under The standard described in *Chapman v. California* (1967) 386 U.S. 18. (See *Valencia, supra,* 11 Cal.5th at p. 840; *Sanchez, supra* 63 Cal.4th at pp. 670–671, 698.) The People

36

must show, beyond a reasonable doubt, that the error did not contribute to the jury's verdict. (*Id.* at p. 698.) The erroneous admission of nontestimonial hearsay is a state law error, which is assessed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818. (*Crawford, supra,* 541 U.S. at p. 68; *People v. Duarte* (2000) 24 Cal.4th 603, 618–619.) The *Watson* test asks if it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson, supra,* at p. 836.)

In this case, we apply the *Chapman* standard of review because the prosecution failed to meet its burden of establishing that its gang expert's testimony did not relate testimonial hearsay in violation of the confrontation clause. Applying this standard, we conclude the error in admitting Detective Fry's hearsay testimony on the second element of predicate offense requirement was prejudicial. For the reasons discussed above, nearly all of the officer's testimony on this subject matter was inadmissible. Detective Fry clearly related case-specific hearsay in testifying about any supposed gang membership of Green, Ford and Randolph, garnered not from personal knowledge but from police reports or field interviews. All of these case-specific facts, which Detective Fry asserted to be true, substantially formed the basis of his opinion that Green, Ford and Randolph were Fly Boys gang members at the time they committed the predicate offenses.

The record further reflects that the prosecution also relied on the current offenses to establish the pattern of criminal activity element of the gang enhancement allegations. However, the jury was never instructed that it had to find Runderson, Hawkins or Jones to be Fly Boys gang members in order to consider whether the prosecution proved the requisite predicate offenses. In fact it was instructed that the People need not prove Runderson, Hawkins or Jones was an active or current member of the Fly Boys street gang to find the requisite predicate offenses. We presume that the jury followed the instruction. (*People v. Scott* (2015) 61 Cal.4th 363, 399.)

37

Without Detective Fry's inadmissible hearsay testimony that members of the Fly Boys street gang committed two or more predicate offenses, the prosecution could not establish the pattern of criminal gang activity element of the gang enhancement allegations. Under these circumstances, we cannot conclude beyond a reasonable doubt that the jury would have found the gang enhancement allegations to be true had Detective Fry's testimony about the predicate offenses been properly excluded. The jury's true findings on the gang enhancements alleged against Runderson, Hawkins and Jones must accordingly be reversed.

The People, however, are not foreclosed from retrying the gang enhancement allegations. In determining whether a retrial of an allegation violates double jeopardy, reviewing courts must consider all the evidence admitted at trial and submitted to the jury to establish whether there was substantial evidence by relying on the law as it existed at the time of trial. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 39–42.) The double jeopardy clause does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supports the conviction. (*U.S. v. Chu Kong Yin* (9th Cir. 1991) 935 F.2d 990, 1001; *People v. Cooper* (2007) 149 Cal.App.4th 500, 522; see *In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1509–1510.) At the time of trial, our Supreme Court's decision in *Gardeley* was still controlling precedent. Upon remand, the People may retry appellants on the gang allegations.

Appellants also contend the trial court erroneously placed limits on cross-examination of various witnesses, thereby violating the right to confront and defend against the gang enhancement allegations. Because we reverse the gang enhancements as to each appellant, further issues as to whether the trial court erred when it prohibited certain lines of cross-examination as to the basis of the gang experts' opinions on the gang need not be addressed.

38

III.    SECTION 12022.53, SUBDIVISION (d) ENHANCEMENT

Appellants were all sentenced under the section 12022.53, subdivision (d) firearm enhancement to an additional 25 years on count 1. While appellants were all charged with various section 12022.53 arming enhancements, Runderson and Hawkins were not charged pursuant to section 12022.53, subdivision (d). They were both charged with section 12022.53, subdivision (e). Both Runderson and Hawkins contend, however, that the sentence imposed as to section 12022.53, subdivision (d) was a violation of their fair notice of charges against them, and to due process of a fair trial, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because the application of subdivision (d) as a vicarious enhancement was not properly pleaded and proved pursuant to section 12022.53, subdivision (e)(1).

"[S]ection 12022.53 imposes progressive sentence enhancements of 10 years, 20 years, or 25 years to life, for progressively egregious firearm use applicable to certain enumerated felonies." (*People v. Yang* (2010) 189 Cal.App.4th 148, 154.) "Section 12022.53, subdivision (e)(1), imposes vicarious liability under this section on aiders and abettors who commit crimes in participation of a criminal street gang." (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171.) Thus, "when the offense is committed to benefit a criminal street gang, the statute's additional punishments apply even if, … the defendant did not personally use or discharge a firearm but another principal did." (*People v. Brookfield* (2009) 47 Cal.4th 583, 590.)

In order to find an aider and abettor, who is not the shooter, liable under section 12022.53, subdivision (d), the prosecution must plead and prove that a principal committed an offense enumerated in section 12022.53, subdivision (a); a principal intentionally and personally discharged a firearm and proximately caused great bodily injury or death to any person other than an accomplice during the commission of the offense; the aider and abettor was a principal in the offense; and the offense was

39

committed for the benefit of, at the direction of, or in association with any criminal street gang, with the intent to promote or assist in the conduct by gang members. (*People v. Garcia, supra*, 28 Cal.4th at p. 1174.)

As argued by Runderson and Hawkins, "[a]lthough the information mentioned subdivision (e)(1), it did not articulate how the prosecution intended to apply it as to each defendant, and it was not pleaded with uniformity as to the two counts to which it was potentially applicable (counts one and two)." Runderson and Hawkins then cite to the information, showing that, as to count 1, inter alia, it was alleged Runderson personally used a firearm (§ 12022.53, subd. (b)); all three appellants were principals in the commission of the offense (§ 12022.53, subd. (e)(1)); and Jones personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). As to count 2, the information alleged, inter alia, that appellants personally used a firearm (§ 12022.53, subd. (b)); Runderson was a principal in the offense (§ 12022.53, subd. (e)(1)).

Runderson and Hawkins also argue that the verdicts did not include a finding that either of them was a principal discharging a firearm causing great bodily injury pursuant to section 12022.53, subdivision (d), since the verdict forms made true findings on the section 12022.53, subdivisions (b) and (e)(1) only (on both counts 1 and 2 as to Runderson and Hawkins and on count 2 only as to Runderson).

Runderson and Hawkins argue further that the instructions given stated that the jury was to separately consider the evidence as it applied to each defendant; to consider personal use of a firearm (§ 12022.53, subd. (b)), on count 1 only as to Runderson; and to consider personal discharge of a firearm (§ 12022.53, subd. (d)), only as to Jones. As to the vicarious enhancement pursuant to section 12022.53, subdivision (e)(1), on count 1, Runderson and Hawkins contend the trial court gave an instruction that failed to distinguish between a principal personally using a firearm, and a principal discharging a

40

firearm causing great bodily injury. A similar version of the same instruction was given as to count 2, as to Runderson only.

Respondents argue Runderson's and Hawkins's claim fails for three reasons: (1) They forfeited their claim that the prosecution did not plead the requirement of section 12022.53, subdivision (e)(1) because they did not object when the trial court instructed the jury or when the court provided verdict forms asking the jury to make a finding under subdivision (e)(1); (2) the allegations gave Runderson and Hawkins fair notice that the People were seeking vicarious liability on the subdivision (d) enhancement; and (3) the jury's verdicts included the requisite findings for imposing vicarious liability under subdivisions (d) and (e)(1).

We agree that Runderson and Hawkins forfeited their claim by failing to object when the trial court instructed on and provided verdict forms asking that the jury make a finding under, section 12022.53, subdivision (e)(1). While a defendant has a due process right to notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes (*People v. Pettie* (2017) 16 Cal.App.5th 23, 82), when a defendant fails to object to the adequacy of the notice received, any such objection is deemed waived. (*People v. Bright* (1996) 12 Cal.4th 652, 671, overruled on another point in *People v. Seel* (2004) 34 Cal.4th 535, 550 & fn. 6.) A defendant cannot claim a lack of notice when he expressly or impliedly consents to have the trier of fact consider the enhancement based on the court's proposed instructions and verdict forms. (*People v. Houston* (2012) 54 Cal.4th 1186, 1226–1229.)

As to instructions, the trial court, without objection, instructed with CALCRIM No. 1402 that, if it found appellant guilty of the attempted murder or robbery, and the crime was committed for the benefit of a criminal street gang, it "must then decide whether the People have proved the additional allegation that one of the principals personally and intentionally discharged a firearm during that crime and caused great

41

bodily injury." The instruction required that the People prove the allegation as to each appellant and return a separate finding as to each.

In any event, addressing the issue on the merits, Runderson and Hawkins had fair notice of the vicarious liability enhancement. As noted above, the information, as to count 1, alleged, inter alia, that, in the commission of the attempted murder, Runderson personally used a firearm (§ 12022.53, subd. (b)); that Jones personally and intentionally discharged a firearm proximately causing great bodily injury (§ 12022.53, subd. (d)); that all three appellants were principals in the commission of the offense (§ 12022.53, subd. (e)(1)); and that the offense was committed for the benefit of a street gang. Thus, the information satisfied the pleading requirements of section 12022.53, subdivision (e)(1) and provided fair notice to Runderson that the People sought to impose vicarious liability for the subdivision (d) enhancement and to Hawkins that the People sought vicarious liability for the subdivisions (b) and (d) enhancements.

Similarly, the information for count 2, alleged, inter alia, that in the commission of the robbery, all three appellants personally used a firearm (§ 12022.53, subd. (b)); that Jones personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)); that Runderson was a principal in the offense (§ 12022.53, subd. (e)(1)); and that the offense was committed for the benefit of a street gang. The information satisfied the pleading requirements of section 12022.53, subdivision (e)(1), providing Runderson with fair notice that the People sought to impose vicarious liability on the subdivision (d) enhancement.

Furthermore, the prosecution proved the elements making Runderson and Hawkins vicariously liable for the section 12022.53, subdivision (e)(1) enhancement. Appellants were jointly tried. The verdict forms for Runderson and Hawkins, as to counts 1 and 2, and Runderson, as to count 2, found each a principal in the commission of the offense, pursuant to section 12022.53, subdivision (e)(1). And while these verdict

42

forms did not ask the jury to make an additional finding that any principal in the offense committed any act specified in section 12022.53, subdivision (d), the jury specifically found, as to both counts 1 and 2, that Jones "personally and intentionally discharged a firearm which proximately caused great bodily injury or death to Brandon Morris as alleged in Penal Code Section 12022.53(d)." Thus, the jury necessarily found that a principal in the offense committed any act specified in section 12022.53, subdivision (d), thereby proving the requirements for imposing vicarious liability on Runderson and Hawkins under subdivision (e)(1).

In view of the foregoing, we conclude that Runderson and Hawkins received adequate notice of the section 12022.53, subdivision (d) enhancement.

However, we strike the section 12022.53, subdivision (d) and subdivision (e) enhancements as to Runderson, Hawkins and Jones, as we explain below.

Section 12022.53, subdivision (d) provides, in pertinent part: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), … personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, … shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

Section 12022.53, subdivision (e), provides, in turn, that the enhancement provided in subdivision (d) shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: "(A) The person violated subdivision (b) of section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

And, as explained in *People v. Garcia, supra,* 28 Cal.4th 1166, in order to find an aider and abettor, who is not the shooter, liable under section 12022.53, subdivision (d), the prosecution must plead and prove that "(1) a principal committed an offense enumerated in section 12022.53, subdivision (a) …; (2) a principal intentionally and

43

personally discharged a firearm and proximately caused great bodily injury or death to any person other than an accomplice during the commission of the offense; (3) the aider and abettor was a principal in the offense; and (4) the offense was committed 'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' (§§ 186.22, subd. (b)(1) & (4), 12022.53, subd. (e)(1).)" (*People v. Garcia, supra,* at p. 1174.)

The prosecution's theory and the verdict forms show that Jones was the shooter and Runderson and Hawkins were aiders and abettors. Important to our analysis here is the fact that section 12022.53, subdivision (d) only applies if a person, as an aider and abettor, has also violated section 186.22, subdivision (b). Because we have determined that the true findings on the gang enhancements are to be stricken, we further conclude that the true findings on the section 12022.53, subdivision (d) enhancements as to Runderson and Hawkins must be struck.

## IV. SENATE BILL NO. 620

The jury also found true the section 12022.53, subdivision (b) allegations alleged against appellants. As a result, the trial court imposed but stayed 10-year terms as to each. Appellants assert, in supplemental briefing, that the matter must be remanded for the trial court to consider whether it would strike the sentence for the firearm enhancement based on the enactment and effective date of Senate Bill No. 620 (2017–2018 Reg. Sess.). The People concede the sentencing provisions of Senate Bill No. 620 are retroactive since appellants' cases are not yet final, but they disagree that remand is necessary.

A.  Applicable Law

Imposition of firearm enhancements under section 12022.53 was previously mandatory, and the terms could not be stricken in the interest of justice pursuant to section 1385 or any other provision of law.  (*People v. Kim* (2011) 193 Cal.App.4th 1355, 1362-1363; *People v. Sinclair* (2008) 166 Cal.App.4th 848, 852–853; *People v. Felix* (2002) 108 Cal.App.4th 994, 999; *People v. Thomas* (1992) 4 Cal.4th 206, 213–214.)

On October 11, 2017, the Governor signed Senate Bill No. 620, which became effective January 1, 2018.  Senate Bill No. 620 amended section 12022.53 to give discretion to the trial court to strike firearm enhancements in the interest of justice.  The statute now states:

> "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."
> (§ 12022.53, subd. (h).)

B.  Remand

Appellants and the People agree that Senate Bill No. 620's amendments apply retroactively to cases not yet final on appeal but disagree whether remand is appropriate in this case.  (*People v. Brown* (2012) 54 Cal.4th 314, 323; *People v. Francis* (1969) 71 Cal.2d 66, 75–76; *In re Estrada* (1965) 63 Cal.2d 740, 746.)

Remand is necessary when the record shows the trial court proceeded with sentencing on the erroneous assumption it lacked sentencing discretion.  (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)  If, however, the record shows the sentencing court "'"would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required."'" [Citation.]"  (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

The People assert that remand is appropriate as to Runderson and Hawkins, but not as to Jones, because the section 12022.53, subdivision (b) enhancement was based on

his personal use of a firearm and there was no indication the trial court would have chosen to impose a lesser sentence. At the sentencing hearing, however, the trial court specifically stated it had no discretion to an allegation under section 12022.53. Remand is therefore appropriate. In any event, we have already determined that remand is required due to our finding that the gang enhancement and section 12022.53, subdivision (d) and (e) findings must be struck. The trial court may, at resentencing, determine whether to exercise its statutory discretion to strike the enhancements under section 12022.53, subdivision (b).

V. SUFFICIENCY OF THE EVIDENCE AS TO THE SUBSTANTIVE OFFENSES

Jones was charged, as were Runderson and Hawkins, with attempted murder, second degree robbery and assault with a deadly weapon. On appeal Jones claims the only evidence tying him to any of these offenses was the "constitutionally deficient gang evidence," requiring reversal of the substantive offenses. We disagree.

As stated above, when reviewing the sufficiency of the evidence to support a conviction, we examine the entire record to determine whether or not there is substantial evidence from which a reasonable jury could find beyond a reasonable doubt that the crime has been committed. We do not reweigh the evidence and we draw all reasonable inferences in favor of the trial court's decision and ask whether there is sufficient reasonable credible evidence of solid value that would support the conviction. (*People v. Russell, supra,* 187 Cal.App.4th at pp. 987–988.)

To support his claim, Jones highlights the inconsistencies in Brandon M.'s testimony, speculates as to Brandon M.'s true intent in traveling to Fresno, suggests B.B. and Brandon M.'s friendship with Runderson and Hawkins biased their testimony, and stated their testimony was inconsistent with alibi testimony from Jones's mother and aunt. Jones contends only the gang evidence "provided the missing link between the

46

shooting" and himself, and that it "inflamed the passions of the jury" by suggesting he was "an incorrigible criminal miscreant."

What Jones is asking that we do is to reweigh the evidence, which we will not do. "'"Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) A reversal for insufficient evidence is unwarranted unless it appears that, upon no hypotheses whatever, is there sufficient substantial evidence to support the jury's verdict. (*Ibid.*)

The evidence before the jury was that Brandon M. identified Jones as the shooter from a photo lineup and at trial. Brandon M.'s identification of Jones was bolstered by evidence he had met Jones before and knew him by the nickname "Bud," a name similar to the name used by Jones of his Facebook page—"Bub da Stunna." B.B. told Officer Mayo that one of the individuals involved in the shooting was called "Bub." And importantly, and not mentioned by Jones in his argument, Jones's handprint was found on Brandon M.'s car.

We find sufficient evidence to support Jones's convictions and reject his claim to the contrary.

## VI. PRETRIAL IDENTIFICATION PROCEDURE

Jones next contends Brandon M.'s pretrial identification of him was tainted by an unduly suggestive identification procedure employed by Officer Mayo. Defense counsel did not object to Jones's pretrial identification. Because of this, the claim has been forfeited. (*People v. Elliott* (2012) 53 Cal.4th 535, 585-586.) We nevertheless address the issue on the merits because Jones claims ineffective assistance of counsel in the alternative. Both arguments are unavailing, as we find the identification procedure used did not violate his due process rights.

47

A. Background

Officer Mayo testified that, four days after Brandon M. was shot and robbed, she showed Brandon M. a photo lineup that included Jones's photograph. The photos were on six separate full sheets of paper. Officer Mayo testified she selected the individuals in the six photographs because they were similar in age and appearance, and the photographs had been taken at a similar angle. Officer Mayo presented the photos sequentially, instead of in a six-pack format, because there were no mug shots or booking photos of Jones, nor did he have a driver's license or California identification card. As a result, she had to find "another source" for the photographs to use in a lineup and obtained Jones's photograph from a school resource officer. Officer Mayo testified that the five people included in the lineup were Fly Boys gang members, but the source of those photographs is unclear.

All of the photographs appear to be of African-American males, of a similar age and with short hair. The photos are of the face and shoulders of each individual, although the backgrounds are different. Two have on light-colored shirts, the other four, including Jones, dark-colored shirts. One subject, not Jones, is pointing his middle finger and four, including Jones, have metal grills on their front teeth. The other two have closed mouths and their teeth are not visible.

Officer Mayo testified that she placed the photographs face down on a table and asked Brandon M. to look at them, which he did by turning over the photos one at a time. After looking at all of the photographs, Brandon M. said the shooter looked like number 3 (Jones) and number 6 (the person pointing his middle finger). Brandon M. pointed to Jones's photograph and said, "He looks the closest," but he did not remember the shooter having a gold grill. Brandon M., pointing at Jones's photograph said, "He looks like him for real, I remember them eyes, man, being like that. I don't know if he has a grill."

48

Brandon M. also mentioned Jones's hair and skin as being similar to what was in the photograph. Brandon M. also said, "He's the one who shot me. He had the gun."

After the sequential photo lineup, which Officer Mayo left on the table, she showed Brandon M. two group photographs so that Brandon M. could have a "chance to have a full-length view." The first group photo was of four African-American "young boys and men." Jones was the only one in the group photo who had also been included in the sequential lineup. Brandon M. circled Jones.

The second group photos included Jones as well as one other subject from the sequential lineup. Before identifying Jones, Brandon M. again mentioned the shooter's eyes and said his hair was "similar, but it was a little cleaner." Brandon M. said the person in the photo had a similar build as Jones, but he was not sure if the shooter had an earring. Brandon M. told Officer Mayo the individual he was looking at could "possibly be him too," and asked if "this is the same dude?" Officer Mayo told Brandon M. she could not tell him that. Brandon M. testified that Officer Mayo had said "'I can't answer that. We know who the guy is, but we can't tell you. You have to pick.'" Officer Mayo asked Brandon M. to circle the person who looked like the person who shot him, and Brandon M. circled Jones.

B. Applicable Law

"'"In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) 'whether the identification procedure was unduly suggestive and unnecessary,' and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances.'"'" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942 (*Gonzalez*).) When making this determination, the court takes "into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of

49

certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*) [citing, among other cases, *Manson v. Brathwaite* (1977) 432 U.S. 98, 104–107 and *Neil v. Biggers* (1972) 409 U.S. 188, 199–200].)

The defendant bears the burden of demonstrating the existence of an unduly suggestive and unreliable identification procedure. (*People v. Avila* (2009) 46 Cal.4th 680, 700; *Gonzalez, supra,* 38 Cal.4th at p. 942.) "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." (*People v. Yeoman* (2003) 31 Cal.4th 93, 125.) "[T]here must be a 'substantial likelihood of irreparable misidentification' under the ""'totality of the circumstances'"" to warrant reversal of a conviction on this ground." (*Cunningham, supra,* 25 Cal.4th at p. 990.)

### C.  Analysis

We have reviewed the first six photographs presented to Brandon M., and they are not unduly suggestive: all six photographs are the same size, they depict African-American males, similar in age with short hair.  Jones does not stand out.  (*Cunningham, supra,* 25 Cal.4th at p. 990 [finding photographic lineup not unduly suggestive where defendant's photograph was similar to the others]; see also *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1082, disapproved on other grounds in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370 [lineup not unduly suggestive where "photographs in a lineup are of males of the same ethnicity and 'generally of the same age, complexion, and build'"].)  Nor does Jones stand out in either of the group photos shown Brandon M.  Officer Mayo provided the group photos because the individual photos were "taken at an odd angle" and she wanted Brandon M. "to have a chance to have a full-length view."  Finally, Officer Mayo did not improperly suggest to Brandon M. he should pick a particular

50

photograph.  In fact, when Brandon M. asked, "Is this the same dude?", Officer Mayo told Brandon M. she could not tell him, a fact verified by Brandon M. at trial.

Even if we assume the photographic lineup was unduly suggestive, suppression was not required if "the identification itself was nevertheless reliable under the totality of the circumstances." (*People v. Thomas* (2012) 54 Cal.4th 908, 930 (*Thomas*).)  Factors to consider include "the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification."  (*Ibid.*)

Here, the record demonstrates Brandon M.'s identification of Jones was reliable.  Brandon M. was able to see the shooter before and during the robbery.  The shooter was facing Brandon M., and Brandon M. was shot at close range.  Brandon M. provided a description of the shooter to the police.  Brandon M. noticed the shooter's eyes and made his identification of Jones in part on his eyes.  Thus, Brandon M. had a good opportunity to "view the suspect at the time of the offense." (*Thomas, supra,* 54 Cal.4th at p. 930.)  The photographs were shown Brandon M. within a week of the incident.

In addition, Jones was not a complete stranger to Brandon M.  Brandon M. had met Jones before and knew him by his nickname of "Bud."  Before he was shot, Brandon M. heard other people refer to the shooter as "Bud."  Two days after he was shot, Brandon M. told Officer Mayo he knew the shooter by the nickname of "Bud," a name similar to "Bub da Stunna," the name Jones used on his Facebook page.

In sum, based on our consideration of the totality of the circumstances, we conclude Brandon M.'s pretrial identification of the Jones was reliable and not unduly suggestive and did not violate Jones's constitutional due process rights.

51

## VII. PROPOSITION 57

In November 2016, after Jones was convicted, the electorate passed Proposition 57, the "Public Safety and Rehabilitation Act of 2016" (Proposition 57). Proposition 57 prohibits prosecutors from charging juveniles with crimes directly in adult court. Instead, they must commence the action in juvenile court. If the prosecution wishes to try the juvenile as an adult, the juvenile court must conduct what we will call a "transfer hearing" to determine whether the matter should remain in juvenile court or be transferred to adult court. Only if the juvenile court transfers the matter to adult court can the juvenile be tried and sentenced as an adult. (See Welf. & Inst. Code, § 707, subd. (a).)

Jones, who was 16 years old at the time of the offenses, contends, and the Attorney General concedes, that Proposition 57 requires that we vacate the sentence, conditionally reverse the convictions, and remand to the trial court with directions to refer the case to the juvenile court for a transfer hearing to determine the propriety of prosecution of the case in adult criminal court. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 310 (*Lara*).)

If the juvenile court determines it would not have transferred Jones to criminal court under current law, the juvenile court shall treat Jones's convictions as juvenile adjudications and impose an appropriate disposition. (*Lara, supra,* 4 Cal.5th at p. 310.)

If the juvenile court decides it would have transferred Jones to criminal court, the case shall be transferred to criminal court, which shall reinstate Jones's convictions but conduct a resentencing hearing in accordance with this opinion.

## DISPOSITION

As to Runderson, Hawkins and Jones, the gang enhancement pursuant to section 186.22, subdivision (b) is reversed and, as to Runderson and Hawkins, the section 12022.53, subdivision (d) enhancement is reversed. In all other respects, the judgments

52

are affirmed and the matter remanded to the trial court. As to Runderson and Hawkins, the People have 60 days from the date of the remittitur to file an election to try Runderson and Hawkins on the reversed gang enhancement. Following retrial, or if the People elect not to retry Runderson and Hawkins, the trial court shall resentence them accordingly, exercising its discretion under section 12022.53, subdivision (h), shall cause their abstracts of judgment to be amended in a manner consistent with this disposition, and shall send certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.

As to Jones, his convictions and sentence are conditionally reversed and remanded to the juvenile court with directions to conduct a juvenile transfer hearing. (Welf. & Inst. Code, § 707.) When conducting said hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Jones's cause to a court of criminal (adult) jurisdiction. (*Id.,* subd. (a)(1).)

If, after conducting the juvenile transfer hearing, the juvenile court finds it would not have transferred Jones to a court of criminal (adult) jurisdiction, it shall treat Jones's convictions as juvenile adjudications, as modified by this opinion.

If, after conducting the juvenile transfer hearing, the trial court determines it would have transferred Jones to a court of criminal (adult) jurisdiction because he is not a fit and proper subject to be dealt with under the juvenile court law, then Jones's convictions and sentence shall be reinstated, as modified by this opinion. (Welf. & Inst. Code, § 707.1, subd. (a).)

Thereafter, the People have 60 days from the date of the remittitur to file an election to try Jones on the reversed gang enhancement. Following retrial, or if the People elect not to retry Jones, the trial court shall resentence him accordingly, exercising its discretion under section 12022.53, subdivision (h), shall cause the abstract of

53

judgment to be amended in a manner consistent with this disposition, and shall send certified copies of the amended abstract to the Department of Corrections and Rehabilitation.

FRANSON, ACTING P. J.

WE CONCUR:

PEÑA, J.

SMITH, J.